## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
### Denver Division

**ELINA GILBERT,**

        **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　**CIVIL ACTION NO. 1:23-cv-00034**

**NATIONSTAR MORTGAGE LLC;**
**EXPERIAN INFORMATION SOLUTIONS, INC.;**
**TRANSUNION, LLC; and**
**EQUIFAX INFORMATION SERVICES, LLC,**

        **Defendants.**

### COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, ELINA GILBERT ("Plaintiff"), by and through her undersigned counsel, alleges the following against Defendants NATIONSTAR MORTGAGE LLC[1] ("Nationstar"), EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian"), TRANS UNION LLC ("Trans Union"), and EQUIFAX INFORMATION SERVICES, LLC ("Equifax").

### PRELIMINARY STATEMENT

1.　　This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x ("FCRA"); and the Real Estate and Settlement Procedures Act, 12 U.S.C. §§ 2601–2617 ("RESPA").

2.　　Today in America there are three major consumer reporting agencies, Experian Information Solutions, Inc., Trans Union, LLC, and Equifax Information Services, LLC. These agencies are also referred to collectively as the "CRAs."

---

[1] Nationstar Mortgage LLC doing business as Mr. Cooper.

3.      The FCRA demands the CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report pursuant to 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it pursuant to 15 U.S.C. § 1681i.

4.      The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Nationstar, particularly where a consumer makes a dispute about information reported.

5.      Also, when a consumer like Plaintiff disputes the accuracy of information through the agencies, those disputes are transmitted to the party furnishing the information, here Nationstar. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.      Plaintiff brings claims under Section 1681e(b) against all three CRAs because each CRA reported inaccurate information about the Plaintiff regarding her Nationstar mortgage account. When Plaintiff disputed these inaccuracies, the CRAs did not reasonably investigate, also violating Section 1681i.

7.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, SUPERVISORY HIGHLIGHTS CONSUMER REPORTING SPECIAL EDITION 21 (Issue 14, March 2, 2017).  This is particularly true as to how the CRA Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. The CRA Defendants have been repeatedly sued by consumers, sanctioned by regulators and reprimanded by both District and

Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

8.      Likewise, Nationstar violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and thereafter failed to reasonably investigate those disputes. Instead, discovery will show all that Nationstar did was consult its own records about the account and confirm to the CRAs the inaccurate information it was already reporting.

9.      Plaintiff further alleges claims against Nationstar for its violations of RESPA, 12 U.S.C. §§ 2605(e) and (k). Plaintiff disputed aspects of his mortgage account with Nationstar, but it failed to meet its obligations under RESPA when Plaintiff disputed.

## JURISDICTION AND VENUE

10.      The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p.

11.      Venue is proper in this District and Division because the violations described in this Complaint occurred in this District and each of the Defendants transact business within this District and Division.

## PARTIES

12.      Plaintiff, Elina Gilbert is a natural person and "consumer" as defined by § 1681a(c).

13.      Nationstar Mortgage LLC does business as Mr. Cooper and is a limited liability company headquartered in Texas and it does business in the state of Colorado through its registered agent.

14.      Nationstar is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2 and a "mortgage servicer" as defined by RESPA.

15.     Defendant Experian Information Solutions, Inc. is headquartered in California and does business in the state of Colorado through its registered agent.

16.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

17.     Defendant Trans Union LLC is headquartered in Illinois and does business in the state of Colorado through its registered agent.

18.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

19.     Defendant Equifax Information Services, LLC is headquartered in Georgia and does business in the state of Colorado through its registered agent.

20.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

21.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v.*

*Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

22.    "Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

23.    Section 1681i(a), on the other, hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through her dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

24.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

25.    It has long been the law that a CRA, such as Experian, Trans Union and Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by

merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at \*9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

26.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

27.     As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed. 2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

28.     Further, as the CRA Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that the CRA Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable"

and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

29.    It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[2]

30.    Today, furnishers such as Nationstar and other of the CRA Defendants' furnishers, have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  But while the CRA Defendants' duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much recent, enacted on in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### *Plaintiff Discovers the CRA Defendants Were Inaccurately Reporting the Nationstar Account as Past Due in April and May 2021*

31.    At all times relevant herein until June 2022, Nationstar was the mortgage servicer of Plaintiff's mortgage loan for her primary residence in Highlands Ranch, Colorado for loan number ending in -0229.

---

[2] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

32.     Like so many Americans, Plaintiff was negatively impacted by the Covid-19 pandemic.

33.     Effective June 1, 2020, Plaintiff entered into a forbearance agreement with Nationstar. The terms of the forbearance specifically stated during the forbearance plan, there would be "no negative credit reporting."

34.     The forbearance period was extended through February 28, 2021 and at its expiration, Plaintiff was due for her June 1, 2020 mortgage payment.

35.     Pursuant to the terms of the forbearance agreement, at the expiration of the forbearance term, the full amount due during the term would be due and Plaintiff could either pay the amount in full to bring the account current or one of her other options was to enter into a Loan Modification Agreement in which her account would be brought current.

36.     On or about January 19, 2021, prior to the expiration of Plaintiff's loan forbearance agreement, Plaintiff and her husband notified Nationstar that Plaintiff is ready to get off the forbearance plan and start making payments.

37.     Nationstar advised Plaintiff and her husband that Plaintiff could not make payments and needed to apply for a loan modification, but has to wait until February 1, 2021 to request the loan modification.

38.     On or about February 1, 2021, Plaintiff and her husband (an authorized third party on the account) called Nationstar to request a loan modification as previously instructed by Nationstar.

39.     On around February 17, 2021, Plaintiff and her husband called Nationstar to confirm Nationstar had all the necessary information to review Plaintiff's loan modification requests and again requested to make payments during the time the modification plan is being

considered, and Nationstar again notified Plaintiff and her husband they cannot make any payments at this time.

40.     Again in February and then in March 2021, Plaintiff's husband called Nationstar to assess the status of the loan modification approval and each time asked to submit a payment, but Nationstar instructed him that payments cannot be submitted on Plaintiff's account at that time.

41.     On around April 6, 2021, Plaintiff's husband called Nationstar about the loan modification and was told Nationstar had everything it needed, Nationstar is just delayed in processing the application.

42.     On around April 8, 2021, Plaintiff received an approval for a trial modification plan (with trial payments due May 1, June 1, and July 1, 2021).

43.     Plaintiff's husband spoke to Nationstar around that same time, and specifically inquired as to whether the delayed approval will impact Plaintiff's credit since they had been trying to make payments on Plaintiff's account since January 2021 and had not been allowed to do so.

44.     Nationstar's representative responded that Plaintiff and her husband were doing exactly what they need to be doing and nothing negative will be reported on the account to the consumer reporting agencies.

45.     On around April 20, 2021, Plaintiff's husband spoke with a Nationstar account representative and was again assured there will be no negative credit ramifications, despite a letter of delinquency Nationstar sent to Plaintiff.

46.     On June 21, 2021, Plaintiff discovered that Nationstar reported her as 120 or more days delinquent on her account for the month of April 2021 to Experian and Trans Union. Plaintiff and/or Plaintiff's husband called Nationstar directly to dispute the credit reporting and followed up by fax to this dispute with copies of Plaintiff's Experian and Trans Union credit reports.

47.     On or about July 8, 2021, Plaintiff signed a Loan Modification Agreement with Nationstar which was effective August 1, 2021.

48.     On around July 9, 2021, Plaintiff discovered Nationstar was reporting the account as delinquent in both April and May 2021, prompting Plaintiff's husband to call Nationstar to dispute the credit reporting again.

49.     During this call, Plaintiff and her husband spoke with the "Special Services" department and the Nationstar representative apologized, stating "I'm sorry our people are missing it" and "as far as the credit hits go, I don't know why that happened, but I put in a credit dispute here."

50.     The representative went on to say that "sometimes things get a little whack when you deal with four million people or four hundred thousand people in the same situation that you're in . . . sometimes things get a little jumbled but we will eventually correct it. We won't let you suffer because of any inept things that we've done." The Nationstar representative also stated: "I apologize for anything that's caused you harm."

51.     On or about July 10, 2021, Plaintiff called Nationstar to dispute the credit reporting yet again.

52.     As of August 1, 2021, Plaintiff was current on her account. However, Nationstar continued to report her as 120 or more days past due on the account for the months of April and May 2021.

53.     Plaintiff has an exceptional credit history but for the inaccurate and derogatory reporting by Nationstar.

54.     Around January 11, 2022, Plaintiff submitted a Qualified Written Request to Nationstar disputing Nationstar's derogatory credit reporting on her account amidst contrary

assurances from Nationstar that there would be no negative impact to Plaintiff's credit reporting and subsequent assurances that any negative reporting would be fixed, which it was not.

55.    On February 1, 2022, Nationstar responded to Plaintiff's QWR stating that it could not produce audio recordings and was reporting her account accurately to the consumer reporting agencies.

### *Plaintiff Disputes The Inaccuracies With The CRAs*

56.    On around June 21, 2021, Plaintiff disputed the Nationstar account to Experian and Trans Union. Specifically, Plaintiff disputed Nationstar's reporting of the account as delinquent during the period of April and May 2021 when she relied upon Nationstar's representations that she would suffer no credit harm during the forbearance and trial modification periods.

57.    On or about July 10, 2021, Plaintiff disputed the Nationstar account with Experian again.

58.    On October 12, 2021, following Plaintiff's disputes, Plaintiff obtained copies of her credit reports from Experian and Trans Union which all showed the Nationstar account was still reporting as 120 or 180 days or more past due in April and May 2021.  Plaintiff also obtained a copy of her credit report from Equifax which now also showed the Nationstar account reporting as 180 days or more past due in April and May 2021.

59.    In or around early October 2021, Plaintiff disputed the Nationstar account with Equifax.

60.    On October 14, 2021, Equifax forwarded the results of its investigation in which it verified as accurate the account as being 180 days or more past due in April and May 2021.

61.    In or around early November 2021, Plaintiff disputed the Nationstar account with Experian yet again.

62.     On November 8, 2021, Experian forwarded the results of its investigation in which it verified as accurate the account as being 180 days or more past due in April or May 2021.

63.     On or about January 4, 2022, Plaintiff send a written dispute to Equifax, Experian, and Trans Union via certified mail to dispute the Nationstar account once again.

64.     On January 28, 2022, Experian forwarded the results of its investigation in which it verified as accurate the account as being 180 days or more past due in April or May 2021.

65.     On January 29, 2022, Trans Union forwarded the results of its investigation in which it verified as accurate the account as being 120 days or more past due in April or May 2021.

66.     Upon information and belief, Equifax failed to respond to Plaintiff's January 4, 2022, dispute letter.

67.     Defendants had actual knowledge of these inaccuracies and deliberately chose to ignore and permit the reporting of the inaccurate account.

68.     Upon information and belief, Plaintiff alleges that on one or more occasions Experian, Trans Union and Equifax forwarded Plaintiff's disputes to Nationstar. Upon information and belief, Nationstar was provided notice of Plaintiff's disputes, and, despite this notice, failed and refused to investigate and correct its inaccurate reporting.

69.     Experian, Trans Union and Equifax each received the Plaintiff's disputes, but in each case wholly and entirely failed to conduct the reinvestigations required by law. Instead, Experian, Trans Union and Equifax merely "parroted" the information dictated to it by Nationstar.

70.     Upon information and belief, Experian, Trans Union and Equifax prepared and published to third parties multiple inaccurate consumer reports about Plaintiff that reflected the inaccurate derogatory Nationstar account.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

71.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of the CRA

Defendants to refuse to perform that statutorily mandated FCRA investigation and instead delegate

all action in response to consumer disputes to a third-party outsource vendor located overseas.

Both Equifax and Trans Union use the same vendor, previously known as Intelenet Global Services

and now as Teleperformance. Experian uses a sister company, Experian Chile (or Experian Costa

Rica) to process its mailed disputes.

72.     These dispute processing vendors are not hired to perform an actual FCRA

investigation.  Instead, the vendors' sole responsibility is to read consumer dispute letters, select

one of a handful of common dispute codes from a drop-down menu and then click that code.

73.     In fact, the CRA Defendants strongly encourage consumers to make disputes

through their online websites.  When consumers do so, the consumer must click one of just a few

available dispute reasons (such as "Not my account.").  The online dispute then is outputted into

the "e-Oscar" system described below without ever touching human hands or being read by human

eyes at Equifax, Trans Union, or Experian. It gets sent to the CRA Defendants' creditor customer

(such as Nationstar) for its sole review and consideration.

74.     Here is how the written mail dispute process actually works: for Equifax, a third-

party document processing company in Atlanta maintains several Post Office boxes for receiving

consumer mail to Equifax such as disputes, requests for a credit file disclosure or other

communication.  That mailbox company receives consumer disputes, scans them into a batch of

other disputes.

75.     Trans Union, on the other hand, receives and scans the mail into batches directly

out of its facility in Eastern Pennsylvania.

76.    Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

77.    Teleperformance and Experian Chile agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

78.    Equifax and Trans Union have both taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court just this year, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv*., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

79.    Trans Union has taken and succeeded with this same position. *See, e,g.*, *Wilcox v. Servis One, Inc*., No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).[3]

---

[3] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice.

80.     Regardless of whether these statements are correct, Equifax, Trans Union, and Experian believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

81.     Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's many disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *The CRA Defendants Forwarded Plaintiff's Disputes To Nationstar, Who Did Nothing*

82.     In each instance in which Plaintiff disputed the Nationstar account with the CRAs, the CRAs forwarded Plaintiff's disputes to Nationstar using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

83.     e-Oscar is also the system by which Nationstar has agreed it will accept such consumer disputes from the CRAs.

84.     Under such circumstances, Nationstar became obligated under the FCRA to investigate Plaintiff's disputes.

85.     Plaintiff's disputes to Nationstar to attempt to have it reinvestigate her complaints went unanswered, as it continued to report the derogatory history regarding the Plaintiff.

86.     Nationstar failed to reinvestigate Plaintiff's complaints.

---

*Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.).

To the extent Experian would reverse course from *Sublett* and argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Equifax and TransUnion for their farming-out of investigations to Teleperformance.

87.    The information furnished by Nationstar to Equifax, Experian and Trans Union was at all times inaccurate.

88.    On or about a date better known to Experian and Nationstar, Experian furnished Plaintiff's disputes to Nationstar.

89.    Nationstar failed to reasonably reinvestigate Plaintiff's disputes that Nationstar received from Experian in violation of § 1681s-2(b)(1)(A) of the FCRA.

90.    Defendant Nationstar further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Nationstar and prior to the commencement of this action.

91.    Experian responded to Plaintiff's disputes on or about July 9, July 30, November 8, 2021 and January 8, 2022, claiming the information reported was verified as accurate and the information was updated. This response confirms that Experian communicated Plaintiff's disputes to Nationstar on multiple occasions.

92.    On or about dates better known to Equifax and Nationstar, Equifax furnished Plaintiff's disputes to Nationstar.

93.    Nationstar failed to reasonably reinvestigate Plaintiff's disputes that Nationstar received from Equifax in violation of § 1681s-2(b)(1)(A) of the FCRA.

94.    Defendant Nationstar further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's dispute from Equifax and prior to the commencement of this action.

95.    Equifax responded to Plaintiff's dispute on October 14, 2021 claiming the information was reported verified as accurate and the information was updated. This response confirms that Equifax communicated Plaintiff's dispute to Nationstar on more than one occasion.

96.     On or about a date better known to Trans Union and Nationstar, Trans Union furnished Plaintiff's disputes to Nationstar.

97.     Nationstar failed to reasonably reinvestigate Plaintiff's disputes that Nationstar received from Trans Union in violation of § 1681s-2(b)(1)(A) of the FCRA.

98.     Defendant Nationstar further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information for a period of time after receiving Plaintiff's dispute from Trans Union and prior to the commencement of this action.

99.     Trans Union responded to Plaintiff's disputes on or about July 13, 2021 and January 29, 2022, claiming the information was reported verified as accurate and the information was updated. This response confirms that Trans Union communicated Plaintiff's disputes to Nationstar on more than one occasion.

100.     By its actions as described herein, Nationstar furnished and communicated false credit information in an attempt to oppress and harass Plaintiff into paying more money that what Plaintiff actually owed.

### *Plaintiff Suffered Actual Harm*

101.     Defendants have continued to report the derogatory Nationstar account on the Plaintiff's credit report, despite being notified that this information was false.

102.     Plaintiff has been attempting to resolve these matters with Defendants and her credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

103.     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

    a.  Stress and fear associated with damage to her credit and how that may affect her small business because of the false Nationstar derogatory reporting on Plaintiff's credit reports;

    b.   Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

    c.   Loss of time attempting to cure the error;

    d.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life; and

    e.   Stress associated with attempting to resolve this matter in the last year.

### *Defendants' Conduct Was Willful*

104.    The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

105.    Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

106.    As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

107.    The CRA Defendants have received many thousands of disputes and other complaints regarding the creditors at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

108.     Just in federal court alone, during the last decade the creditor-furnisher disputed by Plaintiff has had to defend hundreds of consumer lawsuits.

109.     In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

110.     The CRA Defendants knew or should have known of this litigation history.  They use and have access to PACER to investigate and monitor such consumer complaints.

111.     The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

112.     Each Defendant regularly receives unredacted consumer dispute details from this database.

113.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

114.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

115.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

116.     Further, over 35,000 of the CFPB complaints against Equifax, more than 33,000 complaints as to Experian, and just shy of 38,000 against Trans Union were based largely on their failure to reasonably investigate consumer disputes.

117.     Nationstar has approximately 780 such consumer credit complaints against it.

118.     Just in the last 12 months alone, Experian, Equifax, and Trans Union have each been sued on by consumers alleging their violation of the FCRA over 2,000 times.  Most of these

alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

119.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

120.    Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc*., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073–74 (D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

121.    Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau*, 608 F.Supp. 972, 976 (M.D. Fla. 1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

122.    Trans Union has long been on even clearer notice. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Trans Union's notice was so substantial that one District Court instructed the jury in a § 1681i(a) trial:

In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, No. CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

123.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

124.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[4]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

125.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

126.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[5]

127.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable

---

[4] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.
[5] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

128.    Among many of the CRA Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

129.    Despite the notice and judicial, regulatory and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

130.    Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of § 1681e(b) of the FCRA – against Experian, Trans Union and Equifax

131.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

132.    Defendants Experian, Trans Union and Equifax willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

133.    As a result of this conduct, action and inaction of Experian, Trans Union and Equifax, the Plaintiff suffered damage by loss of credit, loss of the ability to purchaseand benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why she lost the ability to benefit from credit.

134.    Further, after the Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Experian, Trans Union and Equifax ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

135.    Each Defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information and each Defendant did so after receiving notice of these inaccuracies.

136.    As a result of Experian, Trans Union and Equifax's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

137.    Experian, Trans Union and Equifax's conduct, action and inaction was willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

138.    The Plaintiff is entitled to recover her costs and attorney's fees from Experian, Trans Union and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### Violation of § 1681i of the FCRA – against Experian, Trans Union and Experian

139.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

140.    Experian, Trans Union and Equifax willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in the Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Plaintiff's creditors and/or creditors' attorneys; by failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

141.    Further, Experian, Trans Union and Equifax violated Section 1681i by conducting *no investigation at all*. Section 1681i demands that when Plaintiff notified each CRA directly of

her disputes, that party-the consumer reporting agency who received the disputes-must investigate those disputes. The statute does not contemplate someone other than Experian, Trans Union and Equifax conducting the investigation.

142.    Yet, both Equifax and Trans Union used an unrelated third-party, Teleperformance, over which neither CRA has control, to conduct its investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax and Trans Union therefore violated 1681i on this basis because they sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.

143.    Furthermore, Experian used an unrelated third-party, Experian Chile, over which Experian has no direct control, to conduct its investigations. Experian Chile is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Experian therefore violated 1681i on this basis because it sent Plaintiff's disputes away to a company that was not its controlled agent rather than investigating them as required.

144.    As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

145.    Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

146.    The Plaintiff is entitled to recover her costs and attorneys' fees from Experian, Trans Union and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### Violation of § 1681s-2(b)(1)(A) and (B) of the FCRA – against Nationstar

147.    The Plaintiff realleges and incorporates the foregoing paragraphs above as if fully set out herein.

148.    Defendant Nationstar violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of the Plaintiff's disputes after said disputes were furnished to Nationstar by Experian, Trans Union and Equifax.

149.    On one or more occasions within the past two years, by example only and without limitation, Nationstar violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided to it by Experian, Trans Union and Equifax.

150.    Based on the way Experian, Trans Union and Equifax responded to-or did not respond to-Plaintiff's disputes, representing that Nationstar had verified the supposed accuracy of its reporting, Plaintiff alleges that Experian, Trans Union and Equifax did in fact forward the Plaintiff's dispute via ACDV to Nationstar.

151.    Nationstar understood the nature of Plaintiff's disputes when it received the ACDVs from Experian, Trans Union and Equifax.

152.    Notwithstanding the above, Nationstar follows a systematically unlawful process when it receives an ACDV dispute.  Basically, all Nationstar does is review its own internal computer screens for the account and repeat back to the ACDV system the same information it already has reporting to Experian, Trans Union and Equifax.

153.    When Nationstar receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether the information already in its computer system itself is inaccurate.

154.    As a result of Nationstar's violations of 15 U.S.C. § 1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages including but not limited to loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

155.    As a result of Nationstar's violations of 15 U.S.C. § 1681s-2(b), the Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

156.    Nationstar's conduct, action and inaction was willful and it is liable for actual, statutory and punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative Nationstar was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

157.    The Plaintiff is entitled to recover her costs and attorneys' fees from Nationstar in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**Violation of § 1681s-2(b)(1)(C) and (D) of the FCRA – against Nationstar**

158.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

159.    On one or more occasions within the past two years, by example only and without limitation, Nationstar violated 15 U.S.C. §1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiff's credit files with Experian, Trans Union and Equifax in response to her disputes without also including a notation that the debt was disputed and by failing to correctly report results of an accurate investigation to Experian, Trans Union and Equifax.

160.    On information and belief, Plaintiff alleges that Nationstar rarely if ever adds the notation that the account is disputed when it responds to the e-Oscar ACDVs.

161.    Plaintiff's disputes were, at minimum, bona fide.

162.    As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiff suffered actual damages including but not limited to:  loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotion distress.

163.    As a result of Nationstar's violations of 15 U.S.C. § 1681s-2(b), the Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

164.    Nationstar's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Nationstar was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

165.    Nationstar was aware of the *Saunders v. Branch Banking & Trust* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

166.    On information and belief, Plaintiff alleges that the procedures followed regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that Nationstar intended its employees or agents to follow.

167.    On information and belief, Plaintiff alleges that Nationstar's employees or agents did not make a mistake in the way he or she followed Nationstar's procedures when he or she received, processed and responded to Experian, Trans Union and Equifax's ACDVs and did not include any notation that the account was disputed.

168.    On information and belief, the Plaintiff alleges that Nationstar has not materially changed its FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of its failures in this case.

169.    Plaintiff is entitled to recovery actual damages, statutory damages, punitive damages, costs and attorney's fees from Nationstar in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT V
## Violation of § 1681s-2(b)(E) of the FCRA – against Nationstar

170.    The Plaintiff realleges and incorporates the foregoing paragraphs as it fully set out herein.

171.    Defendant Nationstar violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Experian, Trans Union and Equifax and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Nationstar's failure to investigate as articulated herein, after Nationstar received notice of Plaintiff's disputes from Experian, Trans Union and Equifax.

172.    As a result of this conduct, action and inaction of Nationstar, the Plaintiff suffered actual damages, including but not limited to  by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, reduction in lines of credit, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why she lost the ability to benefit from credit.

173.    As a result of Nationstar's violations of 15 U.S.C. § 1681s-2(b), the Plaintiff is entitled to recover her actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative her statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

174.    Nationstar's conduct, action and inaction was willful, it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

175.    The Plaintiff is entitled to recover her costs and attorneys' fees from Nationstar in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT VI
## Violation of RESPA, 12 U.S.C. § 2605(e) – against Nationstar

176.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set forth herein.

177.    On one or more occasions within the past two years, by example only and without limitation, Plaintiff made a qualified written request to Nationstar insisting that it conduct an investigation to correct inaccurate account information, inaccurate credit reporting, inaccurate charges to her account, and to provide information regarding her loan.

178.    Plaintiff forwarded a qualified written request on or about January 11, 2022.

179.    On February 1, 2022, Nationstar sent Plaintiff a letter acknowledging her QWR, but failed to correct inaccurate account information and inaccurate credit reporting on Plaintiff's account.

180.    Upon information and belief, Nationstar continued to report derogatory information to the CRAs including to the CRAs during the 60-day period following its receipt of Plaintiff's qualified written request.

181.    Nationstar violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), by:

   a.  Failing to timely conduct an appropriate investigation of Plaintiff's inquiries;

   b.  Failing to conduct any investigation whatsoever regarding Plaintiff's inquiries;

    c.   Failing to timely provide Plaintiff's with a true and accurate written explanation or clarification of the Plaintiff's legitimate questions regarding her loan;

    d.   Continuing to report information regarding allegedly overdue payments to the national credit bureaus, including during the 60-day period following its receipt of Plaintiff qualified written request.

182.    As a result of Nationstar's violations of 12 U.S.C. § 2605(e), the Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

183.    Nationstar is liable for actual damages in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f).

184.    Nationstar's conduct appears to be a pattern and practice of misconduct with many consumers. Plaintiff is a victim of this pattern of misconduct. For each violation of 12 U.S.C. § 2605(e), Nationstar is also liable to Plaintiff for additional damages up to $1,000 per violation.

141.    Plaintiff is also entitled to recover costs and attorneys' fees from Nationstar in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f)(3).

## JURY DEMAND

142.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory and punitive damages against Defendants; for her attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate; specific performance and injunctive relief; and such other relief the Court deems just and proper.

Respectfully Submitted,
**ELINA GILBERT**

By:_____*/s/ Leonard A. Bennett*_____
Leonard A. Bennett, Esq.
Craig Marchiando, Esq.
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
Email: lenbennett@clalegal.com
Email: craig@clalegal.com

*And*

s/ Matthew R. Osborne
11178 Huron St., Ste 7
Northglenn, CO 80234
(303) 759-7018
matt@mrosbornelawpc.com

*Attorneys for Plaintiff*